UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBERT MYERS**,<br><br>                Petitioner,<br><br>vs.<br><br>**ANTHONY HEDGPETH**, Warden,<br><br>                Respondent. | Civil No.     11cv3051 H (PCL)<br><br>**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

PETER C. LEWIS, United States Magistrate Judge.

      This Report and Recommendation is submitted to the Honorable Marilyn L. Huff, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for the Southern District of California.

**I.    INTRODUCTION**

      Petitioner Robert Myers, a prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his convictions of two counts of first degree murder, three counts of attempted premeditated murder, and two counts of shooting into occupied vehicles, following a jury trial in San Diego County Superior Court on August 20, 2008. (Lodgment 7, at 500-14.) In his habeas petition, Petitioner presents five claims: 1) trial court erred by abusing its discretion in admitting surreptitiously recorded statements made inside the patrol car because they were highly prejudicial; 2) trial court failed to bifurcate trial of the gang enhancements from the underlying substantive charges; 3) trial court erred in instructing the jury that Petitioner could be convicted as a conspirator because

conspiracy is "not a valid theory of criminal liability;" 4) the cumulative effect of the alleged errors deprived Petitioner of his due process right to a fair trial; and 5) Petitioner's sentences of life without the possibility of parole constitute cruel and unusual punishment under the Eighth Amendment because he was only 17 years old when he committed the crimes. (Doc. 1.) Petitioner also makes a formal request for an evidentiary hearing and appointment of counsel. (Id. at 31.)  This case is before the undersigned Magistrate Judge pursuant to Local Rule 72.1(c)(1)(c) for Proposed Findings of Fact and Recommendation for Disposition.  For the reasons set forth below, the Court respectfully recommends the Petition be **DENIED** and the matter dismissed with prejudice.

## II.    PROCEDURAL BACKGROUND

On July 9, 2008, the San Diego County District Attorney filed an amended information charging Petitioner with the following: two counts of first degree murder (Pen. Code § 187(a)); three counts of attempted premeditated murder (Pen. Code § 664/187(a)); and two counts of shooting into occupied vehicles (Pen. Code § 246). (Lodgment 7, at 202-05.) On August 20, 2008, a jury found Petitioner guilty on all seven counts. (Id. at 500-14.) On October 30, 2008, the trial court sentenced Petitioner to life in prison without the possibility of parole on each of his first degree murder convictions and three consecutive terms of 21 years to life on each of his three attempted murder convictions. (Id. at 359-61.) In addition, the court imposed consecutive weapon enhancements of 25 years to life on each murder and attempted murder count. (Id. at 518.) The sentences for his two convictions for shooting into occupied vehicles and enhancements were stayed pursuant to Penal Code section 654. (Id.)

On November 18, 2008, Petitioner filed a notice of appeal (Lodgment 6.) In his appeal, Petitioner asserted the following claims: (1) the trial court erred by abusing its discretion in allowing hearsay evidence of statements made inside the patrol car by people other than Petitioner; (2) the trial court erred by not allowing the gang allegations to be bifurcated from other charges; (3) the trial court erred by instructing the jury that it find Petitioner guilty of the charges if it found he conspired with the others to commit the charged offenses because conspiracy is "not a valid theory of criminal liability;" (4) the combined impact of the errors alleged above was prejudicial and caused Petitioner to be denied a fair trial; (5) Petitioner's life sentences without the possibility of parole on his two first degree murder convictions constitute cruel and unusual punishment under the United States Constitution because he was only 17 years old when he committed his crimes; and (6) the trial court erred by imposing a $5,000

parole revocation fine because he had been sentenced to state prison for life without the possibility of parole. (Id.) On July 21, 2010, the state court of appeal affirmed the trial court's judgment and denied Petitioner's appeal, but modified the judgment of the superior court by striking the $5,000 parole revocation fine imposed pursuant to section 1202.45. (Lodgment 3.) On August 23, 2010, Petitioner appealed the court of appeal's decision to the California Supreme Court, which was subsequently denied on October 1, 2010. (Lodgment 1.)

Petitioner filed the instant Petition for Writ of Habeas Corpus on December 30, 2011, with the following contentions: (1) it was trial error to admit evidence of surreptitiously recorded statements made by Petitioner, Harris and Thomas while they sat in unattended police vehicles; (2) the trial court committed reversible error when it denied Petitioner's motion to bifurcate trial of the gang enhancements; (3) because conspiracy is not a valid theory of criminal liability, the trial court committed an error that violated federal due process rights when it instructed the jury that Petitioner could be found guilty on a conspiracy theory of criminal liability; (4) the cumulative effect of the errors committed at trial rendered the proceedings fundamentally unfair, in violation of federal due process rights; and (5) the prison term of life without possibility of parole violates the proscription of cruel and unusual punishment in the federal constitution because Petitioner was a juvenile when the offenses occurred. (Doc. 1.) Respondent filed his response to Petitioner's habeas corpus petition on April 27, 2012. (Doc. 12.) The Court ordered Petitioner to file a traverse no later than June 8, 2012. (Doc. 14.) Petitioner did not file a traverse by the court-ordered deadline. On July 12, 2012, this Court rejected Petitioner's document titled "Denial and Exception to the Return." (Doc. 17.) On July 31, 2012, this Court construed Petitioner's document as his traverse and allowed an enlargement of time no later than August 31, 2012 for Petitioner to resubmit his traverse. (Doc. 19.) Petitioner did not resubmit a traverse by the court-ordered deadline.

## III.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Summer v. Mata, 449 U.S. 539, 550 (1981) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken verbatim from the California Court of Appeal's opinion:

3                                                                                          11cv3051

This case involves rival street gangs and three related shooting incidents that took place over a 22-hour period. [¶] ... [¶] Myers, whose moniker was "Baby Lunatic," was a member of the Five Nine Brim gang.

*August 13, 2004: The Gribble Street Shooting*

On August 13, 2004, Charles Foster, a member of the Skyline Piru gang, and another Skyline Piru gang member were walking along the intersection of Lausanne Drive and Skyline Drive when they were approached by three black males in a white Ford Expedition. The male in the front passenger seat asked, "What's brackin?" which means "What's up?" Foster replied, "You know what's brackin," and flashed his hand signal for the Skyline Piru gang. The front passenger responded by flashing the hand signal for the Lincoln Park gang. Foster challenged them to get out of the vehicle and fight. The front passenger said, "No. It ain't time yet."

After the Expedition drove away, Foster warned everyone he saw who was a Skyline Piru gang member to watch out for a white truck.

At approximately 8:00 that night, Myeshia Ziegler received a phone call from her boyfriend. He told her to watch out for a white Expedition with occupants that might be driving around shooting people in Skyline. At approximately, 11:30 p.m., Ziegler, Stephanie Robinson and others were in front of a neighbor's house on Gribble Street. When Ziegler and Robinson saw the white Expedition, they hid behind a vehicle in the driveway and yelled to others: "Get down, white Expedition." [¶] ... [¶] Someone in the rear passenger seat flashed a Lincoln Park gang signal.

According to Robinson, there were three black males in the Expedition. [¶] ... [¶]

Shots from the Expedition were fired at Flynt's house. Foster was shot in his left ankle as he ran toward an opened garage door. Flynt told police that the left rear passenger leaned out and fired over the top of the Expedition. Flynt described the shooter as a black male wearing a white baseball cap, white do-rag and white T-shirt. Flynt said he saw five males in the Expedition. Foster saw two males on the passenger side of the Expedition–one was bald and the other was wearing a baseball cap with orange on it, which looked like an old Houston Astros hat. He recognized the bald passenger as the person who, earlier that day, spoke to him from the Expedition.

In the middle of the street near a speed bump, police found a tan-colored baseball cap with an "SD" logo. Police also found four shell casings from a .380 caliber gun and six casings from a .22 caliber gun. Additionally, a missile from a fired round was found, but it was too distorted to determine the caliber.

*August 13, 2004: The Fashion Valley Shooting*

On the night of August 13, five friends–Richard Wilson, Christopher Scott, Kenneth McKnight, Marcus Whitfield and Michael Canty–went to the Padre Gold to attend a "Freaky Friday" club-type event. [¶] ... [¶] McKnight spoke with two females he met outside. Later, the two females went over to a white Expedition parked on the other side.

[¶] ... [¶] The five friends decided to go to the Gaslamp District. They agreed to give a ride to a girl who asked if they could drive her home. [¶] ... [¶]

After they dropped the girl off inside a Naval housing complex across the street from the Padre Gold, McKnight noticed a white Expedition behind them, but did not think much about it. McKnight was riding with Whitfield in the Lexus, which was the lead

car as the three cars headed south on Freeway 163. The next car was Wilson's BMW with Scott. Canty followed them in the Mustang.

As they drove through the Fashion Valley area, McKnight and Whitfield heard a sound "like . . . a tire popping." McKnight looked back, but did not see the other two cars driven by his friends. [¶] ... [¶] Whitfield later called Canty and found that Canty was at UCSD Medical Center. Whitfield drove to the hospital and learned Canty was shot in the arm. Whitfield and McKnight then went back onto Freeway 163 to look for Scott and Wilson.

Scott, who was in the BMW, had heard two or three gunshots and asked Wilson if he heard anything. [¶] ... [¶] Five or six shots were then fired at the BMW. Scott ducked under the glove box and saw that Wilson was lying over the center console. The car was still moving, and, after Scott unsuccessfully attempted to revive Wilson, he tried to stop the vehicle by ramming it toward the center divider. [¶] ... [¶] At that point Scott realized he had been shot in the back.

The California Highway Patrol was dispatched to the Fashion Valley scene at 12:40 a.m. on August 14, 2004. Three shell casings (9 millimeter) were found on the freeway. [¶] ... [¶]

[¶] ... [¶] Wilson died from a gun shot to the back of his head. Scott, who had been shot in his back and in his shoulder, underwent surgery and stayed in the hospital for a week. [¶] ... [¶]

*August 14, 2004: The Meadowbrook Drive Shooting*

At about 9:00 p.m. on August 14, 2004, Alfred Lacy, Lee Smith, Tommy Reynolds and Aaron Moore played basketball in Skyline Park. Afterward, the four of them walked to the bus stop at the intersection of Skyline Drive and Meadowbrook Drive to catch a bus home. While they were waiting for a bus, a white Ford Expedition stopped at a red light at the intersection. Lacy had seen the Expedition several times before at an apartment complex on Potomac Street. [¶] ... [¶] The front seat passenger had moved toward the driver's side and was hanging out the driver's window. He positioned himself to shoot over the top of the vehicle and fired one shot from a handgun that he held with both hands. The bullet struck Smith in the abdomen, killing him. Lacy told police the shooter was wearing a white T-shirt. He also saw the color red inside the vehicle.

When police arrived, Lacy told them they should look for the white Expedition at the apartment complex on Potomac Street. Police Officer Paul Keffer heard the location broadcast on his radio and drove to the area of 6800 block of Potomac Street, where he observed a white Expedition traveling southbound. Keffer followed the Expedition to an apartment complex at 6700 Doriana Street. Before the Expedition came to a complete stop, the rear door on the driver's side opened and a black male, later identified as Dejon Satterwhite, exited and ran. After the vehicle stopped, the right front passenger exited and began walking away from the vehicle. Keffer, who had his gun drawn, yelled for the man to stop. The man, Robert (Ivory) Harris, complied. As the police helicopter and backup units arrived, Keffer handcuffed Harris. Other officers ordered the driver, Edward Thomas, out of Expedition and arrested him.

Myers, who was wearing a red sweatshirt, was sitting in the right rear passenger seat and appeared to be leaning over and putting something under the seat. [¶] ... [¶] After Myers mimicked police orders to raise his hands and turn around, police rushed and tackled him to the ground.

On the floorboard of the back passenger seat and underneath Myers's seat, officers found a .22 caliber rifle. Police also located a silver 9 millimeter Ruger semi-automatic handgun underneath Myers's seat. They also found a box of ammunition, which contained 9 millimeter and .22 caliber rounds. At the shooting scene on Meadowbrook Drive, police found a .389 caliber cartridge.

When the Ford Expedition stopped on Doriana Street, Jimmine Johnson, who was Thomas's girlfriend at the time, and her friend, Kendra Brown were passengers.[¶] ... [¶] After Satterwhite ran, Harris passed a black handgun to Myers. Myers asked Johnson to hold the gun. [¶] ... [¶] Johnson refused.

### *Lacy's Identifications*

After the arrests on the night of August 14, the police drove Lacy to the apartment complex on Doriana Street, where a curbside lineup was conducted. Lacy identified Thomas as the shooter. Lacy also told officers that Myers had been in the Expedition. At trial, Lacy testified he identified Thomas at the lineup because he was the only one wearing a white T-shirt, and he did not recall telling police that Myers was in the Expedition. Furthermore, Lacy testified that he did not see Myers or a person wearing a hooded red sweatshirt in the Expedition and had never seen Myers before. Lacy admitted he did not want to testify as a "snitch" because it was unsafe to do so.

### *The Recorded Statements*

After the arrests on August 14, while Myers and Harris were sitting in the back seat of a police car, their conversation was recorded. The tape also included statements Harris made to Thomas, who was in an adjacent police car. The tape, which was admitted at trial, was replete with gang references.

### *Flynt's Plea Bargain*

Flynt, whose house on Gribble Street, was shot at on the evening of August 13, 2004, has a confrontation with Myers three years later while both were in a holding tank for criminal defendants in the downtown San Diego courthouse. Flynt, a Skyline Piru gang member whose moniker was "Tiny 12-gauge," was told that Myers shot at his house the night Foster was injured. Flynt approached Myers and asked if he was the person who "shot at my house." Myers responded: "I don't know, I probably was." Flynt punched Myers and a fight ensued. Later, Flynt, who was facing a robbery charge, entered a plea agreement with the district attorney's office in which he was allowed to plead guilty to felony grand theft with a sentencing lid of three years eight months. His attorney would be allowed to argue in favor of probation even though Flynt already had been granted probation twice only to have his probation revoked in each instance. [¶] ... [¶] Under the plea bargain, Flynt agreed to testify truthfully in Myers's case; if the trial judge concluded Flynt did not testify truthfully, the plea bargain would be voided.

### *Trial Evidence*

At trial, a forensic criminalist expressed the opinion that the six .22 caliber casings found at Gribble Street were fired from the .22 caliber rifle that police found in the Expedition. The criminalist also testified that the three casings found on Freeway 163 were fired from the 9 millimeter semi-automatic handgun found in the Expedition. Missiles recovered from the Mustang driven by Canty also were fired from the same 9 millimeter semi-automatic handgun. Police never recovered a .380 handgun they believed was used in some of the shootings.

> DNA testing on the baseball cap found on Gribble Street showed that the DNA was a mixture from at least three, and possible as many as seven, people. The predominant contributor to the DNA was Myers. Myers's fingerprints were lifted from the Expedition at the passenger side rear door window, the exterior of the passenger side rear door handle, and on the roof above the rear side passenger door.
>
> Detective Jack Schaeffer of the Black Gangs Team of the San Diego Police Department's Gang Suppression Unit, testified that gang culture was primarily concerned with respect earned by committing violent crimes. [¶] ... [¶] In connection with the gang allegations, Schaeffer testified about three "predicate" crimes committed by Five Nine Brim gang members. [¶] ... [¶]
>
> Schaeffer testified that the Gribble Street drive-by shooting was done for the benefit of the Five Nine Brim gang. He noted, among other things, that the location is in the middle of the Skyline Piru gang territory and multiple weapons were used. [¶] ... [¶] In concluding that the Freeway 163 shootings were committed for the benefit of the Five Nine Brim gang, the detective noted that Canty was a well-known O'Farrell Park gang member, and it is likely the Five Nine Brim gang members assumed those individuals associating with him that evening were members of Canty's gang as well. Shooting Canty–a rival gang member–would increase the status of the Five Nine Brim gang members, Schaeffer said. [¶] ... [¶] Even if the targets were not gang members, the Five Nine Brim gang members would get credit for committing such a violent crime in Skyline territory.

(Lodgment 3, at 4-14.)

**IV. DISCUSSION**

    A.    *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs any petition filed in federal court after April 24, 1996. See Lindh v. Murphy, 521 U.S. 320 (1997). As such, this Petition is governed by the provisions of AEDPA. Id. Under AEDPA, a habeas petition will not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim– (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d) (West 2006). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 72 (2003).

    A federal habeas court may grant relief under the "contrary to" clause if the state court arrives at a conclusion conflicting with established precedents of the Supreme Court on a question of law or if it reaches a different conclusion after encountering facts that are materially

indistinguishable from a relevant Supreme Court precedent. <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions but unreasonably applies it to the facts of a particular case or unreasonably extends it to a new context where it should apply. <u>Taylor</u>, 529 U.S. at 407. Rather, a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 365.

Where there is no reasoned decision from the state's highest court, the reviewing court "looks through" to the underlying appellate court decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991). If the state court does not supply reasoning for its decision, federal habeas review is not de novo but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by <u>Andrade</u>, 538 U.S. at 75-76). However, a state court need not cite to federal law precedents when resolving a habeas corpus claim as long as its results or reasoning did not conflict with clearly established federal law. <u>Early v. Packer</u>, 537 U.S. 3 (2002).

B.   *Analysis*

Petitioner Robert Myers raises five claims in his Petition: (1) the trial court erred by abusing its discretion in allowing hearsay evidence of statements made inside the patrol car by people other than Petitioner; (2) the trial court erred by not allowing the gang allegations to be bifurcated from the underlying substantive charges; (3) the trial court erred by instructing the jury that it find Petitioner guilty of the charges if it found he conspired with the others to commit the charged offenses because conspiracy is "not a valid theory of criminal liability;" (4) the combined impact of the errors alleged above was prejudicial and caused Petitioner to be denied a fair trial; (5) Petitioner's life sentences without the possibility of parole on his two first degree murder convictions constitute cruel and unusual punishment under the United States Constitution because he was only 17 years old when he committed the crimes. (Doc. 1, at 24.) Respondent denies all of Petitioner's allegations. (Doc. 12, at 1.) Furthermore, Respondent asks this Court to deny all other relief and any request for a certificate to appealability. (Doc. 12, at 5.)

1.   *Error to Admit Evidence of Recorded Statements*

Petitioner contends the trial court erred in admitting evidence of recorded statements made by Petitioner and Harris in a police vehicle, and Thomas in an adjacent police vehicle, shortly after their arrests, because the evidence was "offensive," and "more prejudicial than relevant" under Evidence Code Section 352. (Doc. 1 at 28.) Petitioner asserts the "recorded statement was extremely prejudicial because it tended to evoke an emotional bias against Petitioner as an individual that far outweighed its probative value because the conversation was peppered with offensive language," which included the words "'fuck' and 'bitches' that [could] prejudice jurors against Petitioner." (Id. at 30.) Petitioner asserts the recording "was likely to confuse the jurors to discern which person on the recording made the various statements." (Id.) Petitioner alleges that the trial court erred when it "expected the jury to determine the meaning and significance of statements on the recording that were difficult for the court and counsel to comprehend," and "submitting that evidence to the jury invited a decision based on speculation and conjecture." (Id. at 31.) Petitioner contends that because the person who transcribed the recording typed "INAUD" for inaudible more than 100 times in the seven plus pages of the conversation transcript, the problem of interpreting statements made on the recording was exacerbated. (Id.) Furthermore, Petitioner argues that even if the trial court properly admitted evidence of the patrol car conversation with Harris, "it nevertheless should have redacted that portion of the conversation in which appellant said he had exercised the right to remain silent when he talked to police," which invoked his Miranda rights. (Id.)

As an initial matter, federal habeas courts "do not review questions of state evidence law." Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). Thus, the admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999, *as amended* Oct. 25, 1999). The admission of evidence violates due process when two circumstances are met: (1) "there are no permissible inferences the jury may draw from the evidence"; and (2) the evidence is "of such quality as necessarily prevents a fair trial." Jammal, 926 F.2d at 920.

The trial court may properly determine the probative value of recorded statements. Watts v. Hedggepeth, 2008 WL 2486515, 10 (C.D. Cal., 2008). In Watts, the trial court admitted contents of

1  a tape-recorded conversation where Petitioner used extensive profanity and concluded that the jury
2  would not convict Petitioner because of his foul language. Id. Furthermore, a motion to suppress
3  secretly recorded conversation between defendant and co-defendant in back of patrol car was
4  properly denied; the fact that defendants wondered out loud whether they were being taped
5  established that they had no subjective expectation of privacy. U.S.C.A. Const. Amend. 4; U.S. v.
6  Jurado, 26 Fed. App'x. 640, 641 (9th Cir. 2001). Fifth Amendment protection is equally inapplicable
7  because "a necessary element of compulsory self-incrimination is some kind of compulsion."
8  Jurado, 26 Fed. App'x. at 641; Hoffa v. U.S., 385 U.S. 293, 304 (1966).

9  Since the California Supreme Court denied Petitioner's habeas corpus petition without
10 comment, this Court looks through to the decision articulated by the California Court of Appeal. See
11 Ylst, 501 U.S. at 801-06. Applying the balancing test of Section 352, the California Court of Appeal
12 concluded that the evidence was admissible. (Lodgment 3, at 19-20.) A review of the trial court
13 records indicates that it did not unreasonably apply the probative-prejudicial standard because "[t]he
14 portions of the tape that were understandable established Myers' and Harris' attempts to get their
15 story straight as well as Myers' involvement with the Five Nine Brims gang." (Id. at 19.) Myers'
16 alternative argument that even if the court did not abuse its discretion in admitting the tape, it should
17 have redacted Myers' statement because he invoked his Miranda rights also fails. The court of
18 appeal accurately found no error in the trial court's decision not to redact the tape. (Id.) Myers'
19 statement on the tape was a response to Harris' question about what he said to the police as they
20 were trying to get their story straight; this was not a Fifth Amendment violation of Doyle because
21 the prosecutor did not reference Myers' statement in a manner that violated the fifth amendment. (Id.
22 at 20.)

23 Similarly, this Court agrees with the trial judge's finding that the recorded statements were
24 highly probative to the case and there is no fifth amendment violation. Similar to the trial court in
25 Watts, the trial court stated that it had listened closely to the recording and the arguments, talked
26 about the recording off and on the record, and found that "the probative value far outweighs, given
27 the totality of the circumstances." (Lodgment 9, at 1934); Watts, supra at 10. Both Myers and his co-
28

defendants did not have subjective expectation of privacy because Harris immediately acknowledged that "they got a [tape] recorder in here" and continued talking despite the knowledge of a recording device in the patrol car. (Id. at 1932); Jurado, supra at 641. Myers cannot allege Fifth Amendment protection because he was not forced to say anything, his statements do not constitute compulsed self-incrimination. Id.; U.S.C.A. Const. Amend. 5.

Petitioner is unable to show that the denial of this claim was the result of an incorrect application of, or an unreasonable determination of, facts contrary to clearly established federal laws. For the reasons stated above, the Court recommends that relief for Petitioner's claim of error in admitting evidence be **DENIED**.

2.  *Trial court committed reversible error in denying Petitioner's motion to bifurcate trial of the gang enhancements.*

Petitioner alleges that the trial court should have granted his motion to bifurcate trial of the gang enhancements because the gang allegation evidence was highly prejudicial to Petitioner. (Doc. 1, at 32-37.) However, in his Petition for Writ of Habeas Corpus, Petitioner fails to specify a violation of any federal Constitutional right; thus, no federal habeas relief is available. 28 U.S.C. 2254(d)(1). However, even if it were a federal claim, it would be denied for several reasons mentioned below.

Petitioner contends that "the trial court erred when it denied the motion to bifurcate trial of the gang enhancements because evidence required to prove up those allegations was highly prejudicial and likely influenced the jury to convict appellant for improper reasons." (Id. at 36.) Unlike People v. Hernandez, 33 Cal. 4th 1040 (2004), where the court found relevance in a gang expert's testimony to help the jury understand the significance of the announcement of gang affiliation to illustrate motive and use of fear, Petitioner argues that the gang evidence in this case has little relevance in identifying the shooters and Petitioner's involvement, if any. (Id.) Petitioner argues that "the factual issues [in this case] turned primarily on DNA evidence on the hat found on Gribble Street, the relationships between the three shooting scenes . . . and finally, evidence obtained

at the arrest scene after the third and final shooting." (Id.)

Evidence of gang membership cannot be introduced as substantive proof of intent and culpability. Kennedy v. Lockyer, 379 F.3d 1041, 1055-56 (9th Cir. 2004) (such evidence creates the risk of guilty by association as well as the risk that the jury will equate gang membership with the charged crimes); Williams v. Walker, Case No. CV 06-07314-FMC (SS), 2008 WL 4809223, 6 (C.D. Cal., October 3, 2008) (while gang membership may be used to prove a material fact, such as motive, bias, and identity, "use [of gang membership] to prove a substantive element of the charged crime would likely be unduly prejudicial" (citing Kennedy) (additional citations omitted).

A review of the trial court records indicates the court of appeal accurately found no error in the trial court's denial of Petitioner's motion to bifurcate trial of the gang evidence. The court of appeal agreed with the trial court's assessment that the gang evidence tended to show motive and premeditation because the evidence helped "explain why the three drive-by shootings took place in a relatively short period of time." (Lodgment 3, at 21-24.) The court of appeal also found the admission of expert testimony on gangs was "relevant to explain why some victims, such as Foster and Lacy, were fearful of being labeled a 'snitch' and distanced themselves at trial from earlier identification of the Five Nine Brim gang members." (Id. at 23.) Moreover, "the gang enhancement was 'inextricably intertwined' with the charged offenses in that it assisted in establishing Myers' identity apart from the hat with his DNA left at the scene on Gribble Street, a motive for his crimes, and his requisite intent to commit his crimes." (Id.)

The trial court records show that an extensive hearing had been conducted on motions to introduce the gang evidence. (Lodgment 9, at 69-89.) The trial judge accurately articulated that even though the gang evidence in its own nature was prejudicial (Id. at 83), it was necessary to place things in context for lay persons (Id. at 79) and show motive (Id. at 80-82). Since the gang evidence was used to show motive, premeditation, identity, and help explain the gang mentality, it was properly admitted. Kennedy, supra at 1055-56.

Petitioner is unable to show that the denial of this claim was the result of an incorrect

application of, or an unreasonable determination of, facts contrary to clearly established federal laws. For the reasons stated above, the Court finds that Petitioner's claim of trial error in not bifurcating trial of the gang enhancements is without merit and recommends that relief on this ground be **DENIED**.

3.  *Trial Court violated federal due process principles in presenting jury instructions.*

Petitioner alleges that the trial court erred and violated Petitioner's due process of law rights when it instructed the jury that Petitioner could be found guilty on a conspiracy theory of criminal liability because conspiracy is not a valid theory of criminal liability.[1] (Doc. 1, at 37-44.) Petitioner relies upon the language of California Penal Code section 31, which defines a principal in a crime as either the perpetrator of the crime, or one who aids and abets the perpetrator, and makes no mention of conspirators. Cal. Penal Code § 31; (Id.) Petitioner argues that despite the fact that section 31 does not define conspirators as principals, case law, such as California's People v. Kauffman, 152 Cal. 331 (1907), inaccurately categorizes conspirators as principals in any crime. (Id. at 41.) However, Petitioner fails to specify a violation of any federal Constitutional right in his Petition for Writ of Habeas Corpus; thus, no federal habeas relief is available. 28 U.S.C. § 2254(d)(1). Nonetheless, even if Petitioner did raise a federal due process claim, it would be denied for several reasons mentioned below.

The California Court of Appeal found this claim to be "without merit." (Lodgment 3, at 24.) A review of the trial court records indicates the court of appeal accurately found no error in the trial court's jury instructions that Petitioner could be found guilty of a crime as a direct perpetrator, as an aider and abettor, or on the theory that he had been a member of a conspiracy. (Id.) The court of appeal rejected Petitioner's claim that conspiracy was not a valid theory of criminal liability under California Penal Code section 31, because it was required to "accept the law declared by courts of

---

[1] The information did not allege a separate charge of conspiracy to commit murder. (Lodgment 7, at 1-18.)

superior jurisdiction."[2] Id. at 28-29 (citing Auto Equity Sales, Inc. V. Superior Court, 57 Cal. 2d 450, 455 (1962)).

Here, Petitioner cannot contest his allegations that the state court in his case, or state courts in general, are erroneously interpreting state law. Estelle v. McGuire, 502 U.S. 67-68 (1991). Nor can Petitioner assert that he has a liberty interest in the "correct interpretation of state law." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.1997) (petitioner cannot transform a state law issue into a federal claim by claiming "due process" error). The one exception to the above rules exists where the state court has used a patently incorrect interpretation as a subterfuge to avoid the federal issues. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.1989). In addition, to the extent that Petitioner asks this court to find that the court of appeal erred in this case by denying his claim based on state law, he cites no authority that the federal court is authorized to do so.

In People v. Belmontes, 45 Cal. 3d 744 (1988), the California Supreme Court indicated that conspiracy is a theory of criminal liability:

> It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. (People v. Lopez (1963) 60 Cal. 2d 223, 250 [32 Cal.Rptr. 424, 384 P.2d 16] [uncharged conspiracy to commit burglaries admissible to prove identity of murderer]; People v. Pike (1962) 58 Cal. 2d 70, 88 [22 Cal.Rptr. 664, 372 [45 Cal. 3d 789] P.2d 656] [uncharged conspiracy to commit robberies admissible to prove armed robbery culminating in murder].) "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory (People v. Washington (1969) 71 Cal. 2d 1170, 1174 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]; People v. Ditson (1962) 57 Cal. 2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714])." (People v. Remiro (1979) 89 Cal. App. 3d 809, 842 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135].)

Id. at 788-89. Clearly, jury instructions are a state law issue and Petitioner's claim is not cognizable in federal habeas corpus. Even if this court could rule on state law pursuant to Belmontes, the trial judge properly instructed the jury that Petitioner could be convicted of the substantive offenses based on a conspiracy theory.

---

[2] The California Supreme Court has declared that California Penal Code "section 31 forms the basis for criminal liability based on conspiracy." In re Hardy, 41 Cal. 4th at 1025.

This Court has also conducted an independent review of trial court records and concluded that Petitioner's due process rights were not violated because Petitioner was validly convicted under the conspiracy theory of criminal liability. Petitioner's DNA was found on a baseball cap that fell out of the Ford Expedition near one of the crime scenes. (Lodgment 9, at 1778.) Witness Alfred Lacy originally identified Petitioner as one of the passengers in the Ford Expedition at the time of the shootings. (Id. at 1009.) Moreover, Petitioner exited the vehicle when police arrived to make the arrests. (Id. at 1533-37.) Petitioner also asked a witness to hold a gun when Petitioner noticed that a police car was following the Ford Expedition. (Id. at 1183.) Petitioner admitted to one of the targeted victims of the shootings that it "was, probably was" him that shot at the victim's house. (Id. at 927.) Upon arrest, Petitioner was recorded stating "[t]hey are going to try to hang me homie," "[b]ut Blood if we just stick to the Script South," and he "fucked up" because "[a]ll the pistols were under [his] seat."[3] (Lodgment 8, at 3-4.) The records contain ample evidence from which the jury could rationally infer Petitioner's involvement in a criminal conspiracy and his attempts to conceal weapons in furtherance of a conspiracy. These facts substantiate the trial court's decision to instruct the jury that Petitioner could be convicted of the substantive offenses based on a conspiracy theory.

Petitioner is unable to show that the denial of this claim was the result of an incorrect application of, or an unreasonable determination of, facts contrary to clearly established federal laws. 28 U.S.C. § 2254(d). For the reasons stated above, the Court recommends that relief for Petitioner's claim that trial court erred in instructing the jury on a conspiracy theory of criminal liability be **DENIED**.

    4.    *The cumulative effect of errors committed at trial rendered the proceedings fundamentally unfair, in violation of federal due process principles.*

Petitioner alleges that the cumulative effect of errors committed by the trial court violated Petitioner's Fourteenth Amendment right to Due Process of Law, because the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v.

---

[3] The jury followed along with a transcript while the recording was being played. The transcript was not admitted into evidence and was not allowed into the jury room.

1 DeChristoforo, 416 U.S. 637, 643 (1974). (Doc. 1, at 44-45.) However, the California Court of Appeal accurately rejected the claims raised in Grounds One, Two, and Three of the Petition, so there was no cumulation of errors.

In evaluating a due process challenge based on the cumulative effect of multiple trial errors, a reviewing court must determine the relative harm caused by the errors, and if the evidence of guilt is otherwise overwhelming, the errors are considered harmless and the conviction will generally be affirmed. U.S.C.A. Const. Amend. 14; U.S. v. Acosta, 234 Fed. App'x. 647, 650 (9th Cir. 2007.) As discussed above, this Court also rejects Petitioner's claims in Grounds One, Two, and Three of his Petition. Based on the overwhelming evidence of guilt in this case, we conclude that the errors did not materially affect the verdict. U.S. v. Seschillie, 310 F.3d 1208, 1214 (9th Cir. 2002) (explaining that nonconstitutional error warrants reversal only when it is more probable than not that the error materially affected the verdict)(internal citation omitted).

Accordingly, the Court recommends that relief for Petitioner's claim that his federal due process rights were violated be **DENIED**.

> 5. *The prison term of life without possibility of parole violates the proscription of cruel and unusual punishment under the U.S. Constitution because Petitioner was a juvenile when the offenses occurred.*

Petitioner contends that the sentence of life without the possibility of parole violates the Eighth Amendment to the United States Constitution because he was a juvenile when he committed the offenses. (Doc. 1, at 45.) Petitioner relies on Roper v. Simmons, 543 U.S. 551 (2005), a Supreme Court case which held that the imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed constitutes cruel and unusual punishment. Petitioner alleges that after Roper, "it is no longer clear...that life without parole is constitutional because it is a lesser penalty than death." Respondent refutes Petitioner's contentions citing to the California Court of Appeal opinion, which states that "[t]here is no indication in the *Roper* opinion that a sentence of life in prison without the possibility of parole is unconstitutionally disproportionate when applied to juveniles." (Doc. 12-1, at 26.)

Despite Petitioner's contention, courts have repeatedly stated that the holding in <u>Roper</u> is limited to barring capital punishment for juveniles. see e.g., <u>Harris v. Wright</u>, 93 F.3d 581, (9th Cir. 1996), (holding that a sentence of life without the possibility of parole, where the juvenile commits a homicide, was not unconstitutionally disproportionate to a 15-year-old defendant convicted of murder). More recently, in <u>Miller v. Alabama</u>, 567 U.S. ____, 132 S. Ct. 2455 (2012), a case which involved a juvenile who was convicted of arson-murder, the United States Supreme Court held that mandatory sentences of life without the possibility of parole for juvenile homicide offenders violate the Eight Amendment's prohibition on cruel and unusual punishment. <u>Id.</u> In doing so, the Court reaffirmed their stance that <u>Roper</u> was limited to barring capital punishment for juveniles. <u>Id</u>. Unlike <u>Miller</u>, Petitioner's sentence of life without the possibility of parole was not mandatory. Petitioner was sentenced pursuant to California Penal Code 190.5(b) which states " [t]he penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in *Section 190.2* or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, *shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life*." (Italics added). As indicated, section 190.5(b) of the California Penal Code does not require a mandatory sentence of life without the possibility of parole and vests sentencing courts with the discretion to sentence the defendant to a term of 25 years to life with possibility of parole. Accordingly, Petitioner's claim does not fall within <u>Miller</u> and therefore his sentence of life without the possibility of parole under these circumstances does not violate the proscription against cruel or unusual punishment.

Therefore, the Court recommends that relief for Petitioner's claim that the trial court violated his Eighth Amendment rights when it sentenced him to life in prison without the possibility of parole be **DENIED**.

6. *Request for an Evidentiary Hearing*

Review of habeas claims that have been adjudicated on the merits in State court proceedings is limited to the record that was before the state court that adjudicated the claim on the merits. <u>Cullen</u>

v. Pinholster, 131 S.Ct. 1388, 1401 (2011). Adjudicated on the merits means a decision finally resolving the parties' claims that is based on the substance of the claim advanced, rather than on a procedural, or other, ground. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). Review under § 2254(d)(1) focuses on what a state court knew and did measured against Supreme Court precedent as of the time the state court rendered its decision. Id. Therefore, a federal court must analyze whether a state court's adjudication resulted in an unreasonable application of federal law to the facts that were before it, and a federal court may only hold an evidentiary hearing with respect to claims that were not adjudicated on the merits in state court. Id. Thus, while AEDPA enumerates certain statutory exceptions to the ban on evidentiary hearings in federal court, none of them applies here as Petitioner's claims were all "adjudicated on the merits" either on direct appeal or state collateral review.

Petitioner's five claims were decided on the merits by the state court on direct appeal. (Lodgment 3.) Since the California Supreme Court denied Petitioner's claims without comment (Lodgment 1), the state appellate court opinion constitutes a decision on the merits and this Court may not hold an evidentiary hearing regarding this prayer for relief. Cullen, 131 S. Ct. at 1401. Accordingly, Petitioner's request for an evidentiary hearing is **DENIED.**

//
//
//
//
//
//
//
//
//
//
//

## V. CONCLUSION

For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the District Court issue an Order: (1) approving and adopting this Report and Recommendation ; (2) directing that Judgment be entered **DENYING** Petitioner's claims ; (3) **DENYING** Petitioner's request for an evidentiary hearing; and (4) dismissing this case with prejudice.

IT IS ORDERED that no later than **October 26, 2012**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties no later than **November 9, 2012.** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: September 27, 2012

Peter C. Lewis
U.S. Magistrate Judge
United States District Court