# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT MYERS,<br><br>                  Petitioner,<br>vs.<br><br>ANTHONY HEDGPETH, Warden,<br><br>                  Respondent. | CASE NO. 11-CV-3051-H (PCL)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY** |

On December 30, 2011, Robert Myers ("Petitioner"), a California state prisoner proceeding pro se and in forma pauperis, filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. No. 1.) On April 27, 2012, Anthony Hedgpeth ("Respondent") filed a response in opposition. (Doc. No. 12.) On September 28, 2012, the magistrate judge issued a report and recommendation that the Court deny the petition and dismiss the case with prejudice. (Doc. No. 20.) Neither party has filed objections to the magistrate's report.

## **BACKGROUND**

Three drive-by shootings took place over the course of two days in August 2004, in which five people were shot and two were killed. (Doc. No. 13-3 at pp. 4-8.) The following facts are taken verbatim from the California Court of Appeal's opinion:

> This case involves rival street gangs and three related shooting incidents that took place over a 22-hour period. One of the gangs, the Skyline Piru street gang, was active in the Skyline area of southeast San Diego and frequented the 1300 block of Gribble Street, Skyline Drive and Meadowbrook Drive. The gang was allied with the O'Farrell Park gang. The main rivals of the two gangs were the

Lincoln Park and the Five Nine Brim gangs, which were allied with each other. Myers, whose moniker was "Baby Lunatic," was a member of the Five Nine Brim gang.

*August 13, 2004: The Gribble Street Shooting*

On August 13, 2004, Charles Foster, a member of the Skyline Piru gang, and another Skyline Piru gang member were walking along the intersection of Lausanne Drive and Skyline Drive when they were approached by three black males in a white Ford Expedition. The male in the front passenger seat asked, "What's brackin?" which means "What's up?" Foster replied, "You know what's brackin," and flashed his hand signal for the Skyline Piru gang. The front passenger responded by flashing the hand signal for the Lincoln Park gang. Foster challenged them to get out of the vehicle and fight. The front passenger said, "No. It ain't time yet."

After the Expedition drove away, Foster warned everyone he saw who was a Skyline Piru gang member to watch out for a white truck.

At approximately 8:00 that night, Myeshia Ziegler received a phone call from her boyfriend. He told her to watch out for a white Expedition with occupants that might be driving around shooting people in Skyline. At approximately, 11:30 p.m., Ziegler, Stephanie Robinson and others were in front of a neighbor's house on Gribble Street. When Ziegler and Robinson saw the white Expedition, they hid behind a vehicle in the driveway and yelled to others: "Get down, white Expedition." Charles Foster was down the street with other individuals in front of Darrell Flynt's house. Ziegler's brother Arthur, who was standing on the corner, saw the white SUV traveling west on Gribble Street. Its headlights were turned off. The vehicle was traveling slowly, but sped up as the windows were rolled down. Someone in the rear passenger seat flashed a Lincoln Park gang signal.

According to Robinson, there were three black males in the Expedition. The driver shot over the roof of the vehicle with his left hand over the driver's door. The rear passenger, who was behind the driver, sat on the rolled-down window and leaned over the top of the vehicle as he fired a gun. The front passenger also fired shots. Ziegler told police she saw two shooters.

Shots from the Expedition were fired at Flynt's house. Foster was shot in his left ankle as he ran toward an opened garage door. Flynt told police that the left rear passenger leaned out and fired over the top of the Expedition. Flynt described the shooter as a black male wearing a white baseball cap, white do-rag and white T-shirt. Flynt said he saw five males in the Expedition. Foster saw two males on the passenger side of the Expedition–one was bald and the other was wearing a baseball cap with orange on it, which looked like an old Houston Astros hat. He recognized the bald passenger as the person who, earlier that day, spoke to him from the Expedition.

In the middle of the street near a speed bump, police found a tan-colored baseball cap with an "SD" logo. Police also found four shell casings from a .380 caliber gun and six casings from a .22 caliber gun. Additionally, a missile from a fired round was found, but it was too distorted to determine the caliber.

*August 13, 2004: The Fashion Valley Shooting*

On the night of August 13, five friends–Richard Wilson, Christopher Scott, Kenneth McKnight, Marcus Whitfield and Michael Canty–went to the Padre Gold to attend a "Freaky Friday" club-type event. Scott and Wilson arrived in Wilson's BMW 745. McKnight and Whitfield arrived in Whitfield's Lexus. Canty arrived by himself in a borrowed Mustang. Scott and Wilson

went inside while the others stayed outside in the parking lot. McKnight spoke with two females he met outside. Later, the two females went over to a white Expedition parked on the other side of the lot.

When Scott and Wilson came back outside, they said the crowd inside the Padre Gold was too young. The five friends decided to go to the Gaslamp District. They agreed to give a ride to a girl who asked if they could drive her home. The three vehicles left in tandem, with the girl in Wilson's BMW.

After they dropped the girl off inside a Naval housing complex across the street from the Padre Gold, McKnight noticed a white Expedition behind them, but did not think much about it. McKnight was riding with Whitfield in the Lexus, which was the lead car as the three cars headed south on Freeway 163. The next car was Wilson's BMW with Scott. Canty followed them in the Mustang.

As they drove through the Fashion Valley area, McKnight and Whitfield heard a sound "like . . . a tire popping." McKnight looked back, but did not see the other two cars driven by his friends. There was no answer when McKnight called Wilson on his cell phone. Whitfield later called Canty and found that Canty was at UCSD Medical Center. Whitfield drove to the hospital and learned Canty was shot in the arm. Whitfield and McKnight then went back onto Freeway 163 to look for Scott and Wilson.

Scott, who was in the BMW, had heard two or three gunshots, and he asked Wilson if he heard anything. Wilson turned down the radio. Five or six shots were then fired at the BMW. Scott ducked under the glove box and saw that Wilson was lying over the center console. The car was still moving, and, after Scott unsuccessfully attempted to revive Wilson, he tried to stop the vehicle by ramming it toward the center divider. The car slid 597 feet along the barrier before coming to a stop. At that point Scott realized he had been shot in the back.

The California Highway Patrol was dispatched to the Fashion Valley scene at 12:40 a.m. on August 14, 2004. Three shell casings (9 millimeter) were found on the freeway. One casing was 261 feet from the resting point of the BMW, another one was 1,944 feet from the resting spot and the other was 2,087 feet from the resting point.

Paramedics arrived and transported Wilson and Scott to the hospital. Wilson died from a gun shot to the back of his head. Scott, who had been shot in the back and in his shoulder, underwent surgery and stayed in the hospital for a week. He used a breathing machine for three months. At the time of trial–four years later–one bullet remained in Scott's chest. He also had 30 staples in his chest and felt lingering back pains. He had not returned to work.

*August 14, 2004: The Meadowbrook Drive Shooting*

At about 9:00 p.m. on August 14, 2004, Alfred Lacy, Lee Smith, Tommy Reynolds and Aaron Moore played basketball in Skyline Park. Afterward, the four of them walked to the bus stop at the intersection of Skyline Drive and Meadowbrook Drive to catch a bus home. While they were waiting for a bus, a white Ford Expedition stopped at a red light at the intersection. Lacy had seen the Expedition several times before at an apartment complex on Potomac Street. When the light changed, the Expedition was driven away, but a couple of minutes later, the Expedition returned. The front seat passenger had moved toward the driver's side and was hanging out the driver's window. He positioned himself to shoot over the top of the vehicle and fired one shot from a handgun that he held with both hands. The bullet struck Smith in the abdomen, killing him. Lacy told police the shooter was wearing a white T-shirt. He also saw the color red inside the vehicle.

When police arrived, Lacy told them they should look for the white Expedition at the apartment complex on Potomac Street. Police Officer Paul Keffer heard the location broadcast on his radio and drove to the area of 6800 block of Potomac Street, where he observed a white Expedition traveling southbound. Keffer followed the Expedition to an apartment complex at 6700 Doriana Street. Before the Expedition came to a complete stop, the rear door on the driver's side opened and a black male, later identified as Dejon Satterwhite, exited and ran. After the vehicle stopped, the right front passenger exited and began walking away from the vehicle. Keffer, who had his gun drawn, yelled for the man to stop. The man, Robert (Ivory) Harris, complied. As the police helicopter and backup units arrived, Keffer handcuffed Harris. Other officers ordered the driver, Edward Thomas, out of Expedition and arrested him.

Myers, who was wearing a red sweatshirt, was sitting in the right rear passenger seat and appeared to be leaning over and putting something under the seat. Officers ordered him to put his hands up and get out of the Expedition. In one hand, Myers was carrying a bottle of brandy in a brown paper bag. In the other hand, he had a cigar. Ordered to drop the bottle, Myers took a big swig from it and threw it on the ground. After Myers mimicked police orders to raise his hands and turn around, police rushed him and tackled him to the ground.

On the floorboard of the back passenger seat and underneath Myers's seat, officers found a .22 caliber rifle. Police also located a silver 9 millimeter Ruger semi-automatic handgun underneath Myers's seat. They also found a box of ammunition, which contained 9 millimeter and .22 caliber rounds. At the shooting scene on Meadowbrook Drive, police found a .389 caliber cartridge.

When the Ford Expedition stopped on Doriana Street, Jimmine Johnson, who was Thomas's girlfriend at the time, and her friend, Kendra Brown, were passengers. Thomas had picked up Johnson and Brown at Brown's residence at about 9:30 p.m. They were planning to go to a party. Johnson and Brown entered the Expedition and sat between Satterwhite and Myers on the back seat. While Johnson and Brown were in the Expedition, Harris, sitting in the front passenger seat, waved a handgun in Thomas's face. He did so in a joking manner. Thomas told Harris to put the gun away. Later, someone noticed a police car was following them. When Satterwhite opened the door and ran, one of the other males remarked: "He should have at least taken one of the pistols with him." After Satterwhite ran, Harris passed a black handgun to Myers. Myers asked Johnson to hold the gun. He said the police would not search her because she was female. Johnson refused.

*Lacy's Identifications*

After the arrests on the night of August 14, the police drove Lacy to the apartment complex on Doriana Street, where a curbside lineup was conducted. Lacy identified Thomas as the shooter. Lacy also told officers that Myers had been in the Expedition. At trial, Lacy testified he identified Thomas at the lineup because he was the only one wearing a white T-shirt, and he did not recall telling police that Myers was in the Expedition. Furthermore, Lacy testified that he did not see Myers or a person wearing a hooded red sweatshirt in the Expedition and had never seen Myers before. Lacy admitted he did not want to testify as a "snitch" because it was unsafe to do so.

*The Recorded Statements*

After the arrests on August 14, while Myers and Harris were sitting in the back seat of a police car, their conversation was recorded. The tape also included statements Harris made to Thomas, who was in an adjacent police car.

The tape, which was admitted at trial, was replete with gang references.

### *Flynt's Plea Bargain*

Flynt, whose house on Gribble Street, was shot at on the evening of August 13, 2004, had a confrontation with Myers three years later while both were in a holding tank for criminal defendants in the downtown San Diego courthouse. Flynt, a Skyline Piru gang member whose moniker was "Tiny 12-gauge," was told that Myers shot at his house the night Foster was injured. Flynt approached Myers and asked if he was the person who "shot at my house." Myers responded: "I don't know, I probably was." Flynt punched Myers and a fight ensued. Later, Flynt, who was facing a robbery charge, entered a plea agreement with the district attorney's office in which he was allowed to plead guilty to felony grand theft with a sentencing lid of three years eight months. His attorney would be allowed to argue in favor of probation even though Flynt already had been granted probation twice only to have his probation revoked each instance. Had he been convicted of robbery, Flynt's prison exposure would have been nine years. Under the plea bargain, Flynt agreed to testify truthfully in Myers's case; if the trial judge concluded Flynt did not testify truthfully, the plea bargain would be voided.

### *Trial Evidence*

At trial, a forensic criminalist expressed the opinion that the six .22 caliber casings found at Gribble Street were fired from the .22 caliber rifle that police found in the Expedition. The criminalist also testified that the three casings found on Freeway 163 were fired from the 9 millimeter semi-automatic handgun found in the Expedition. Missiles recovered from the Mustang driven by Canty also were fired from the same 9 millimeter semi-automatic handgun. Police never recovered a .380 handgun they believed was used in some of the shootings.

DNA testing on the baseball cap found on Gribble Street showed that the DNA was a mixture from at least three, and possibily as many as sever, people. The predominant contributor to the DNA was Myers. Myers's fingerprints were lifted from the Expedition at the passenger side rear door window, the exterior of the passenger side rear door handle, and on the roof above the rear side passenger door.

Detective Jack Schaeffer of the Black Gangs Team of the San Diego Police Department's Gang Suppression Unit, testified that gang culture was primarily concerned with respect earned by committing violent crimes. One's status in a gang could be enhanced by committing violent crimes, especially against members of rival gangs. The detective said that members of the Five Nine Brim gang committed such crimes as murder, drive-by shootings, robberies, carjackings and selling drugs. In connection with the gang allegation, Schaeffer testified about three "predicate" crimes committed by Five Nine Brim gang members. Two of the crimes involved robberies and murders; and the third involved a gang fight between the Skyline Piru and O'Farrell Park gangs on one hand and the Five Nine Brim and Lincoln Park gangs on the other, in which a person was murdered and others were injured.

Schaeffer testified that the Gribble Street drive-by shooting was done for the benefit of the Five Nine Brim gang. He noted, among other things, that the location is in the middle of the Skyline Piru gang territory and multiple weapons were used. He also noted the manner in which the Expedition was driven down the street without lights and the fact that Foster, a member of the Skyline Piru gang, was injured. In concluding that the Freeway 163 shootings were

>committed for the benefit of the Five Nine Brim gang, the detective noted that Canty was a well-known O'Farrell Park gang member, and it is likely the Five Nine Brim gang members assumed those individuals associating with him that evening were members of Canty's gang as well. Shooting Canty–a rival gang member–would increase the status of the Five Nine Brim gang members, Schaeffer said. Schaeffer also noted that even if the people who were with Canty were not gang members, committing such a violent crime would increase the status of the Five Nine Brim gang. The detective testified the Meadowbrook Drive shooting was committed for the benefit of the gang because it was inside the territory of the Skyline Piru gang, and it was on a major street near a taco shop where gang members were likely to gather together. Even if the targets were not gang members, the Five Nine Brim gang members would get credit for committing such a violent crime in Skyline territory.

These facts are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1).

On August 20, 2008, a jury in California Superior Court convicted petitioner of two counts of first degree murder, three counts of attempted murder, and two counts of discharging a firearm at an occupied vehicle. (Doc No. 13-11 at pp. 103-118; Doc. No. 13-3 at pp. 1-2.) In addition, the jury found that petitioner committed the offenses for the benefit of a street gang. (Id. at p. 2.) The jury further found that Petitioner was a principle in the offenses and that at least one principle used and intentionally discharged a firearm in the commission of the offenses that caused great bodily injury or death to another. (Id. at pp. 1-2.) Finally, the jury returned special circumstance findings under California Penal Code § 190.2, finding that Petitioner had been convicted of multiple murders and that the murders were perpetrated by discharging a firearm from a motor vehicle. (Id.)

The trial court sentenced Petitioner to two terms of life in prison without the possibility of parole on the murder counts, and three consecutive terms of twenty-one years to life on the attempted murder counts. (Id.) Additionally, the court imposed weapon enhancements of twenty-five years to life on each murder and attempted murder count. (Id.) The California Court of Appeals upheld Petitioner's conviction and sentence on appeal. (Id. at p. 33.) The California Supreme Court denied his petition for review on September 29, 2010. (Doc. No. 13-1.)

///
///
///

# DISCUSSION

## I. Standard of Review

A petitioner in state custody pursuant to the judgment of a state court may challenge his detention only on the grounds that his custody is in violation of the United States Constitution or the laws of the United States. 28 U.S.C. § 2254(a). Pursuant to § 2254(d), a court must not grant a habeas petition unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Clearly established federal law means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 73 (2003). A state court decision is "contrary to" clearly established federal law when the court confronts a set of facts that are materially indistinguishable from a United States Supreme Court decision but reaches a result different from that Supreme Court decision. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision involves an unreasonable application of clearly established federal law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Penry v. Johnson, 532 U.S. 782, 792 (2001) (quoting Williams, 529 U.S. at 407-08) (internal quotation marks omitted). To be an unreasonable application of federal law, the state court decision must be more than incorrect or erroneous; it must be objectively unreasonable. Lockyer, 538 U.S. at 75.

When there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision. Y1st v. Nunnemaker, 501 U.S. 797, 801-06 (1991). A state court need not cite to federal law precedents when resolving a habeas corpus claim as long as its results or reasoning do not conflict with clearly established federal law. Early v. Packer, 537 U.S. 3 (2002). The California Supreme Court denied Myers' petition for review without opinion. (Doc. No. 13-1.) Therefore, the unpublished decision of the California Court of Appeals is the last reasoned state court decision. (Doc. No. 13-3.)

Petitioner claims that the trial court committed numerous errors during trial, and that the cumulative effect of those errors resulted in an unfair trial in violation of the Fifth and Fourteenth Amendments. In addition, Petitioner claims that his sentence of life without the possibility of parole violates the Eighth Amendment because he was a juvenile during the commission of the crimes.

## II.   Whether Cumulative Prejudicial Effect Resulted in Unfair Trial

Petitioner contends that the trial court committed multiple errors during his trial, and that the cumulative effect of the those errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Doc. No. 1 at pp. 44-45); see Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Petitioner claims that, pursuant to California Evidence Code § 352, the trial court should have excluded as unduly prejudicial a tape recording of a conversation between Petitioner, Robert Harris, and Edward Thomas while they sat in the back of police cruisers following their arrests. Alternatively, Petitioner argues that the court should at least have redacted his statement requesting counsel under Doyle v. Ohio, 426 U.S. 610, 618 (1976), and Wainwright v. Greenfield, 474 U.S. 284, 295 (1986). Further, Petitioner argues that the trial court should have granted his motion to bifurcate the trial between the substantive offenses and the gang enhancements because the evidence introduced in support of the gang allegations was highly prejudicial and likely influenced the jury to convict for improper reasons.[1] Petitioner contends that the cumulative prejudicial effect of these errors produced a trial setting that was fundamentally unfair in violation of due process. See Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir. 2003).

As an initial matter, federal courts on habeas review do not "review questions of state evidence law" and "may consider only whether the petitioner's conviction violated

---

[1] Petitioner also argues that the trial court erred as a matter of California law in instructing the jury that it could find Petitioner liable on a theory of uncharged conspiracy. (Doc. No. 1 at pp. 37-44.) Petitioner does not raise any challenge to this instruction under constitutional or federal law. As such, no federal habeas relief is available on this claim. 28 U.S.C. § 2254(d)(1).

constitutional norms." Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999, as amended Oct. 25, 1999). "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1999). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." Id. at 920 (emphasis in original). That is, the evidence in question must not tend to make any fact or consequence more or less probable. Alcala, 334 F.3d at 887. Even then, a petitioner's due process rights are not violated unless the evidence is "'of such quality as necessarily prevents a fair trial.'" Jammal, 926 F.2d at 920 (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

In reviewing Petitioner's claim that the tape recording should have been excluded as unduly prejudicial, the court of appeals determined that:

> Harris did most of the talking during the taped conversation, which is replete with gang references and offensive language, such as "fuck" and references to women as "bitches." There are also numerous portions of the taped conversation that are inaudible or unintelligible.
> On the tape, Harris said he told the police that he had nothing to do with the shooting, he had just been picked up and was getting a ride home. When Harris asked Myers what he told police, Myers replied: "I want to speak to my attorney." Myers also said: "We['re] going to be gone for a long time[,] Blood."
> Harris told Myers that he was not going to take any deals because he did not do anything. Myers replied that he did not do anything either, but added: "They are going to hang me[,] homie. They are going to try to hang me with it." Later, Myers said: "But[,] Blood[,] if we just stick to script[,] South."
> After Harris related that he told police the rifle was the only firearm he saw in the Expedition, Myers said he had "fucked up" because "[a]ll the pistols were under my seat." Harris replied: "What the fuck you put them under your seat for[,] Blood. You were supposed to put them away. That's why I handed them to you."

(Doc. No. 13-3 at p. 17.) The court of appeals concluded that the conversation was highly probative of Petitioner's attempts to come up with exculpatory statements in response to police questioning and relevant to show Petitioner's involvement in the Five Nine Brim gang. (Id. at p. 19.) The court of appeals' conclusion that the recording was relevant was not objectively unreasonable because Petitioner faced weapons charges and gang allegations. 28 U.S.C. § 2254(d)(2); Lockyer, 538 U.S. at 75. Additionally, the recording supports an inference that Petitioner committed the crimes for the benefit of a street gang because in the recording

Petitioner made numerous references to "Blood." Detective Schaeffer testified that the Five Nine Brim gang is a subset of larger gang referred to as "Bloods." (See Doc No. 13-26 at p. 101.) Further, the recording supports an inference that Petitioner placed the firearms that were used in the shootings underneath his seat. (Doc. No. 13-3 at p. 17.) As such, the tape recording tends to make Petitioner's membership in a gang and his involvement in the charged crimes more probable. Alcala, 334 F.3d at 887. Accordingly, the admission of the tape recording did not violate due process. Jammal, 926 F.2d at 919.

Additionally, the failure to redact Petitioner's statement attempting to invoke his right to counsel did not violate due process as explained by the Supreme Court in Doyle or Wainwright. In Doyle, the Court held that the use for impeachment purposes of a defendant's silence in response to police interrogation, at the time of arrest and after receiving Miranda warnings, violates due process because "every post-arrest silence is insolubly ambiguous" as to whether the defendant's silence is an invocation of his Miranda rights. 426 U.S. at 617, 619. In Wainwright, the Supreme Court extended its holding in Doyle, concluding that the use of a defendant's silence in response to police interrogation for purposes of establishing the defendant's sanity violates due process. 474 U.S. at 289.

Here, the trial court's decision not to redact Petitioner's statement requesting counsel did not violate Petitioner's due process rights under Doyle because Petitioner did not request counsel in response to police interrogation. Petitioner told Harris, a co-defendant, that he wanted to speak to his attorney while the two of them were alone in the back of a police car. (Doc. No. 13-3 at p. 17; Doc. No. 1 at p. 27); cf. Howes v. Fields, 132 S. Ct. 1181, 1189 (noting that confinement alone is "not necessarily enough to create a custodial situation for Miranda purposes"). Moreover, the court of appeals concluded that "[a]lmost immediately, Harris realized there was a recording machine in the vehicle and told Myers about it." (Doc. No. 13-3 at p. 17.) Thus, Petitioner made incriminating statements without police coercion or interrogation. Cf. Saleh v. Fleming, 512 F.3d 548, 551 (9th Cir. 2008) (holding that defendant's statements to police did not violate his rights under Miranda because he initiated the phone call and was free to terminate the conversation at any time). Accordingly, the failure

1 to redact Petitioner's statement did not violate due process. Doyle, 426 U.S. at 619.

2 Further, the decision not to bifurcate the trial of the substantive offenses and the gang allegations was not a violation of due process. To violate due process, there must be no permissible inferences that the jury could draw from the evidence. Jammal, 926 F.2d at 920. The court of appeals determined that the "gang evidence was highly probative on the issues of identity, intent and motive." (Doc. No. 13-3 at p. 24.) According to Petitioner, the primary evidence used to prove the gang allegations was the testimony of Detective Schaeffer. (Doc No. 1 at p. 37.) During direct examination, Detective Schaeffer testified that the Five Nine Brim gang and the Skyline gang were rivals and that two months prior to the August 2004 shootings, both gangs got into an altercation in which three people were shot and one was killed. (Doc. No. 13-26 at pp. 106, 120.) He also testified that one of the victims of the August 2004 shootings was a known Skyline gang member. (Id. at p. 149.) Based on Detective Schaeffer's testimony, the Court concludes that the gang evidence supported inferences that the shooters were Five Nine Brim gang members who intended to harm Skyline gang members based on the earlier fight or the general rivalry between the gangs. Jammal, 926 F.2d at 920. Accordingly, the decision to combine the trial of the substantive offenses together with the gang allegations did not violate Petitioner's due process rights. Id. at 919.

In sum, none of the errors alleged by Petitioner resulted in a violation of his due process rights; nor did the cumulative effect of those alleged errors "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Significantly, the court of appeals concluded that the jury was able to carefully weigh the evidence presented at trial as they found Petitioner not guilty of personally and intentionally discharging a firearm causing great bodily injury or death. (Doc. No. 13-3 at p. 25.) As such, Petitioner has not shown that the court of appeals' decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on his due process claim.

///

### III. Whether Petitioner's Sentence of Life without the Possibility of Parole Violated the Eighth Amendment

Petitioner also contends that under Roper v. Simmons, 543 U.S. 551 (2005), his two life sentences without the possibility of parole violate the Eighth Amendment's prohibition on cruel and unusual punishment because he was a juvenile when the offenses occurred.

The Supreme Court held in Roper that the Eighth Amendment prohibits the imposition of the death penalty on juvenile offenders under the age of eighteen. 543 U.S. at 568. In Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012), the Supreme Court held that the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." The Court expressly stated that the Eighth Amendment does not prohibit the imposition of a sentence of life without the possibility of parole for juveniles. Id. Rather, the Court held that the Eighth Amendment requires that a sentencing court be granted discretion to impose a lesser sentence. Id.

Petitioner's sentence does not violate the Eighth Amendment. Petitioner was seventeen years old when the crimes occurred. (Doc. No. 13-3 at p. 30.) The trial court sentenced him to life without the possibility of parole pursuant to California Penal Code § 190.5(b). (Doc. No. 13-3 at p. 31.) Subsection (b) provides:

> The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, *at the discretion of the court, 25 years to life*.

Cal. Penal Code § 190.5(b) (emphasis added). As the text of § 190.5(b) makes clear, the trial court had the discretion to sentence Petitioner for the lesser term of twenty-five years to life. As Petitioner's crimes did not carry a mandatory minimum sentence of life without the possibility of parole, his sentence does not violate the Eighth Amendment. See Miller, 132 S. Ct. at 2469. Accordingly, Petitioner's sentence was not contrary to, nor did it involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Petitioner is not entitled to habeas relief on his Eighth

Amendment claim.

### IV. Certificate of Appealability

Unless a judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from a final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court. 28 U.S.C. § 2253(c)(1)(A). A certificate of appealability may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. Id. § 2253(c)(2). A petitioner makes a substantial showing of the denial of a constitutional right if reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner. Slack, 529 U.S. at 483-84. As such, petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Accordingly, the Court declines to issue Petitioner a certificate of appealability.

### CONCLUSION

Based on the foregoing, the Court accepts the report and recommendation of the magistrate judge, denies the petition for writ of habeas corpus, and declines to issue a certificate of appealability.[2]

**IT IS SO ORDERED**.

DATED: February 13, 2013

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[2] The Court also denies Petitioner's request for an evidentiary hearing because each of Petitioner's claims was decided on the merits by the court of appeals. Cullen v. Pinholster, 131 S. Ct. 1388, 1401 (2011).